## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **DAYTON DWAYNE ARNOLD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **No. 3:14-00442** |
| **v.** | ) | **Judge Nixon/Brown** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER** | ) | |
| **OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

### REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i), 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (DE 9) be **DENIED** and the Commissioner's decision **AFFIRMED**.

### I. PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on March 17, 2010 alleging a disability onset date of May 9, 2010. (Doc. 7, p. 153)[1,2] Plaintiff claimed that he was unable to work because of

---

[1] References to page numbers in the Administrative Record (Doc. 7) are to the page numbers that appear in **bold** in the lower right corner of each page.

[2] The original disability onset date for plaintiff's DIB and SSI claims was August 13, 2007. (Doc. 7, pp. 132, 138, 153-54) A consent to amend the onset date was filed following the September 7, 2012 hearing before the Administrative Law Judge (ALJ). (Doc. 7, p. 153)

back surgeries, heart attacks, HIV infection, shortness of breath, macular degeneration, and depression. (Doc. 7, pp. 68-69, 83, 85) Plaintiff's claims were denied initially on August 18, 2010 and again upon reconsideration on May 25, 2011. (Doc. 7, pp. 64-74, 79-86)

Plaintiff filed a request for a hearing before an ALJ on July 15, 2011. (Doc. 7, p. 87) A hearing was held on September 7, 2012 in Nashville before ALJ Renee Andrews-Turner. (Doc. 7, pp. 31-63) Vocational expert (VE) Nancy Hughes testified at the hearing. (Doc. 7, pp. 31, 50-62)

The ALJ entered an unfavorable decision on September 27, 2012. (Doc. 7, pp. 10-27) Plaintiff filed a request with the Appeals Council on November 19, 2012 to review the ALJ's decision. (Doc. 7, pp. 8-9) The Appeals Council denied plaintiff's request on December 24, 2013,[3] whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 7, pp. 1-5)

Counsel brought this action on plaintiff's behalf on February 13, 2014. (Doc. 1) Plaintiff filed a motion and brief for judgment on the administrative record on June 4, 2014. (Docs. 9-10) The Commissioner responded on June 26, 2014. (Doc. 11) Plaintiff did not reply. This matter is now properly before the court.

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff raises three claims of error in these proceedings. As there is no apparent dispute between the parties as to plaintiff's medical and work history, the Magistrate Judge incorporates plaintiff's summary of his medical and work history (Doc. 10, p. 3) herein by reference. Those parts of the record required to address plaintiff's claims of error are discussed below.

Plaintiff was examined by consulting physician Dr. Theodore Schuman, M.D., on June 26,

---

[3] The lengthy period between plaintiff's request that the Appeals Counsel review the ALJ's decision and when the Appeals Counsel acted on plaintiff's request was due to plaintiff's request for additional time which was granted on March 27, 2013. (Doc. 7, pp. 6-7)

2010 for "an all systems evaluation . . . of back disorder, heart attacks with four stents, HIV+, shortness of breath, hypertension, stomach/bowel problems and depression." (Doc. 7, pp. 415-21)(unnecessary capitalization omitted) Dr. Schuman's medical assessment was that, apart from visual acuity deficit, plaintiff "had no impairment-related limitations . . . ." (Doc. 7, p. 421)

Plaintiff was examined by consulting psychologist Dr. Deborah Doineau, Ed.D., on July 23, 2010 on referral from the Tennessee Disability Determination Services. (Doc. 7, pp. 422-27) Dr. Doineau's diagnostic impression was that plaintiff had moderate recurrent major depressive disorder, and that he abused alcohol. (Doc. 7, p. 425) Dr. Doineau reported that plaintiff stated he was "able to concentrate," and assessed plaintiff with "[n]o limitation" in understanding or remembering, "[m]ild to moderate limitation" in sustaining concentration or pace, "[m]ild" social limitations, and "[m]ild" adaptability limitations. (Doc. 7, pp. 424-25) The ALJ gave "significant weight" to Dr. Doineau's opinion. (Doc. 7, p. 21)

In his physical residual functional capacity (RFC) assessment dated August 5, 2010 (Doc. 7, pp. 428-36), consulting physician Dr. James Gregory, M.D., assessed plaintiff with the following limitations: 1) can lift and/or carry up to 50 pounds occasionally; 2) can lift and/or carry up to 25 pounds frequently; 3) can stand and/or walk up to "about" 6 hours in an 8-hour workday with normal breaks; 4) can sit "about" 6 hours in an 8-hour workday with normal breaks; 5) has unlimited ability to push and/or pull hand and/or foot controls. (Doc. 7, p. 429) Dr. Gregory did not establish any postural, manipulative, or communicative limitations, but he did determine that plaintiff's distance vision was limited. (Doc. 7, pp. 430-32) Dr. Gregory determined that, although plaintiff should avoid concentrated exposure to extreme cold and heat, he had no other environmental limitations. (Doc. 7, p. 432) The ALJ gave "little weight" to Dr. Gregory's opinion because it was "overly optimistic" in light of the examination of consulting physician Dr. Lloyd Huang, M.D., discussed

below, and plaintiff's subjective complaints of pain and fatigue.  (Doc. 7, p. 21)

Dr. Huang recorded the following impressions after examining plaintiff on May 5, 2011: 1) normal HEENT (head, eyes, ears, nose, throat) examination; 2) lungs clear without wheezing or rales[4]; 3) normal heart examination with regular rate and rhythm without murmur, gallop,[5] or rub[6]; 4) normal abdominal examination; 5) normal extremities; 6) cervical spine appeared normal with normal range of motion (ROM); 7) normal ROM of shoulders, elbows, wrists, hips, knees, and ankles; 8) normal handgrip strengths; 9) lumbar spine ROM reduced to 20 degrees extension and 70 degrees flexion; 10) negative straight leg raises to "around 45 degrees"; 11) negative "seated distracted straight leg raises"; 12) "mild cardiomegaly[7] with mild changes consistent with congestive heart failure."  (Doc. 7, pp. 482-83)

Dr. Huang diagnosed plaintiff with Ischemic[8] heart disease, HIV, hypertension, depression, and history of "lumbar radiculopathy,[9] status post two back surgeries."  (Doc. 7, p. 483)  Dr. Huang "estimated" that plaintiff was a "New York Heart Class II,"[10] reported that plaintiff said he could

---

[4]  Rales – "a discontinuous sound . . . heard primarily during inhalation; called also *crackle*."  *Dorland's Illustrated Medical Dictionary* 1576 (32 ed. 2012)(italics in the original).

[5]  Gallop – "a disordered rhythm of the heart . . . ."  *Dorland's* at 756.

[6]  Rub – "a scraping or grating noise heard with the heart beat . . . ."  *Dorland*'s at 1656.

[7]  Cardiomegaly – "abnormal enlargement of the heart . . . ."  *Dorland's* at 294.

[8]  Ischemia – "deficiency of blood in a part, usually due to functional constriction or actual obstruction of a blood vessel."  *Dorland's* at 961.

[9]  Radiculopathy – "disease of the nerve roots . . . ."  *Dorland's* at 1571.

[10]  New York Heart Association (NYHA) Functional Classification – Class II: "Patients with cardiac disease resulting in slight limitation of physical activity.  They are comfortable at rest.  Ordinary physical activity results in fatigue, palpitation, dyspnea [breathlessness or shortness of breath], or anginal pain."  http://www.heart.org/ HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-of-Heart-Failure_UCM_306328__Article.jsp.

"walk around a mile," that he appeared to be "compliant with HIV treatment and [his] CD4 counts[11] . . . [we]re normal," that he "may have a fairly normal life expectancy regarding HIV," and that, although he had two prior back surgeries, there were "no radicular[12] signs" during the examination. (Doc. 7, p. 483)

Dr. Huang completed a medical source statement in which he assessed plaintiff with the following limitations: 1) can lift and/or carry up to 10 pounds frequently; 2) can lift and/or carry up to 20 pounds occasionally; 3) may never lift and/or carry more than 20 pounds[13]; 4) can sit and/or stand one hour without interruption; 5) can walk only 30 minutes without interruption; 6) can sit 5 hours total during an 8-hour workday; 7) can stand 3 hours total during an 8-hour workday; 8) can walk 2 hours total in an 8-hour workday; 9) can reach occasionally overhead, and in all other directions, with both hands; 10) can push/pull occasionally with both hands; 11) can handle, finger, and feel frequently with both hands; 12) can operate foot controls frequently with both feet; 13) can occasionally climb stairs, ramps, ladders, and scaffolds; 14) can occasionally balance, stoop, kneel, crouch and crawl; 15) may operate a motor vehicle occasionally and be exposed occasionally to unprotected heights, moving mechanical parts, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, and vibrations; 16) limited to moderate noise. (Doc. 7, pp. 484-88) Dr. Huang further opined that plaintiff was able to: 17) perform individual activities like shopping; 18)

---

[11] "CD4 cells or T-cells are a type of white blood cell[] that play[s] a major role in protecting [the] body from infection. . . . Once a person is infected with HIV, the virus begins to attack and destroy the CD4 cells . . . ." http://www.aids.gov/hiv-aids-basics/just-diagnosed-with-hiv-aids/understand-your-test-results/cd4-count/.

[12] Radicular – "pertaining to a root . . . ." *Dorland's* at 1571.

[13] This part of the source statement is unclear. It appears from the document itself that Dr. Huang's first thought was that plaintiff could never carry more than 20 pounds. However, the entry in the column labeled "Never" has been obliterated. Instead, what appears to be the number "25" has been written in the column labeled "Occasionally." The lower number, *i.e.*, 20 pounds, has been used here because there is no ambiguity with respect to that number.

travel without a companion or assistance; 19) ambulate without the use of assistive devices; 20) walk a block at a reasonable pace on rough or uneven surfaces; 21) use public transportation; 22) climb a "few steps" at a reasonable pace without the use of a single hand rail; 23) prepare a simple meal and feed himself; 24) care for his personal hygiene; 25) sort, handle and use paper/files. (Doc. 7, p. 489) The ALJ gave "significant weight" to Dr. Huang's opinion. (Doc. 7, p. 21)

In his May 24, 2011 physical RFC assessment, consulting physician Dr. James Finney, M.D., assessed plaintiff with the following limitations: 1) can lift and/or carry up to 20 pounds occasionally; 2) can lift and/or carry up to 10 pounds frequently; 3) can stand and/or walk up to "about" 6 hours in an 8-hour workday with normal breaks; 4) can sit "about" 6 hours in an 8-hour workday with normal breaks; 5) has unlimited ability to push and/or pull hand and/or foot controls. (Doc. 7, p. 493) Dr. Finney determined that plaintiff could never climb ladders, ropes, or scaffolds, but that he could occasionally climb ramps and stairs. (Doc. 7, p. 494) Plaintiff had no other postural limitations. Dr. Finney did not establish any manipulative, visual, or communicative limitations, but he did determine that plaintiff should avoid all exposure to extreme cold, machinery, and heights, and avoid concentrated exposure to extreme heat, fumes, odors, gases, and poor ventilation. (Doc. 7, pp. 495-96) Dr. Finney determined further that plaintiff's claim that his obesity interfered with lifting and walking was not supported by his body mass index. (Doc. 7, p. 497) Dr. Finney also was of the opinion that Dr. Huang's assessment that plaintiff was able to stand only 3 hours total in an 8-hour workday, and walk 2 hours total in an 8-hour workday, was excessive based on Dr. Huang's examination and plaintiff's history. (Doc. 7, p. 498) The ALJ gave "great weight" to Dr. Finney's opinion. (Doc. 7, p. 21)

## B. Transcript of the Hearing

Plaintiff testified upon questioning by counsel that he had not worked since August 2007

after his second heart attack, and that he was not trying to find work.  (Doc. 7, p. 37)  Plaintiff claimed that he "couldn't perform any more . . . didn't have the energy . . . didn't feel like it . . . [and] . . . still ha[d] issues . . . ."  (Doc. 7, p. 37)  He also testified that his symptoms were "not getting better," *i.e.*, he was short of breath and could not stand.  (Doc. 7, p. 38)  Plaintiff claimed to have gotten short of breath just walking from his car to the hearing room.  (Doc. 7, p. 38)

Plaintiff testified that, although he was physically and mentally fatigued, he usually slept no more than "45 minutes to an hour" at a time at night.  (Doc. 7, pp. 38-39)  Plaintiff did not link his inability to sleep to any physical or mental limitation.  He testified, "I just can't sleep.  I just wake up."  (Doc. 7, p. 39)

Plaintiff testified that he suffered from numbness in his left arm and leg, and thought he might have had a stroke.  (Doc. 7, pp. 39-40)  Plaintiff claimed later to have had numbness for "over a year."  (Doc. 7, p. 59)

Plaintiff testified that he experienced chest pains when he exerted himself, *i.e.*, "little twinges" especially when he got hot or winded, although he did not know if the "little twinges" actually were from his heart.  (Doc. 7, p. 40)  Plaintiff gave two examples to illustrate what caused chest pains.  He testified that he put a load of clothes in the washer "two days ago, but they're still in the washing machine . . . [because] . . . I just haven't felt like getting them out and putting them in the dryer."  (Doc. 7, p. 41)  He also claimed that, when he made his bed he would "put one sheet on, have to sit down, and then . . . go back and put the other one on. . . .  I just can't complete a task."  (Doc. 7, p. 41)

Plaintiff testified that he preferred to be by himself, and thought that his preference to be along might be due to depression.  (Doc. 7, p. 38)  According to plaintiff, he "alienated" himself from his friends, but then became depressed when no one asked him to do anything.  (Doc. 7, p. 43)

He testified that he was "more content s[i]tting in front of the television."  (Doc. 7, p. 43)

Plaintiff testified that his HIV medication "cause[d] severe diarrhea," that he had diarrhea every day, and that the HIV medication made him feel "bad."   (Doc. 7, pp. 43-44)  Plaintiff later testified upon questioning by the ALJ that he had diarrhea "[t]wo or three times a week," and that when it occurred, he had to use the restroom "[t]hree or four times, at least."  (Doc. 7, pp. 59-60)

When asked how long he could stand or walk before having to get off his feet, plaintiff responded, that "[i]t really depend[ed]" on where he was and what he was doing.  (Doc. 7, p. 44)  As an example, plaintiff testified, "I'm nothing" after walking to and from the car into Kroger to pick up a loaf of bread.  (Doc. 7, p. 44)  Plaintiff also testified that he was able to stand or walk "[a] couple hours, total time" during an 8-hour workday.  (Doc. 7, p. 45)

When asked about lifting and carrying, plaintiff testified that he "could maybe pick something up, but as far as walking with it, or hoisting it up off the floor and moving it, I just can't." (Doc. 7, p. 45)  He estimated that he could lift a gallon of milk with his right hand, but could not lift it with his left hand because of numbness.  (Doc. 7, p. 45)

When asked about sitting, plaintiff testified that, although he was not having any trouble sitting at the moment, he was "wanting to get up and move around."  (Doc. 7, p. 46)  He estimated that he could sit "maybe 10, 15 minutes at a time," but then he would "have to stand up and change positions, or do something" because he had "never been used to just staying in one spot."  (Doc. 7, p. 46)  Plaintiff equivocated when counsel asked how long he could sit in an 8-hour workday, answering, "I guess if I had to . . . I just don't feel like I could."  (Doc. 7, p. 46)  When asked what position he stayed in for "most of the day," plaintiff replied: "I'll sit at my dining room table . . . I'll go get on the couch . . . sometimes I'll stand up, turn around, sit on my left side, sit on my right side, prop my legs up on the coffee table."  (Doc. 7, pp. 46-47)

Upon questioning by the ALJ, plaintiff testified that he had smoked a "[c]ouple packs" of cigarettes a day for forty-three years, that he "very rarely" drank alcohol, and that he did not use illegal drugs. (Doc. 7, p. 47) Plaintiff admitted that he had not been admitted to any hospital in the past year for emergency reasons. (Doc. 7, p. 48) He also testified that his back bothered him "every once in awhile" to the point he would have to lie on the floor, but admitted that his back was not an every day problem. (Doc. 7, p. 48) Plaintiff also admitted that, although he did not receive mental health care every month, the medication he had been prescribed helped with his depression, but he "still th[ought] about things . . . ." (Doc. 7, pp. 49-50)

In questioning the VE, the ALJ instructed the VE to consider four hypotheticals. The hypothetical relevant to the matter before the court, *i.e.*, the third hypothetical, is quoted below.

> [A]ssume an individual the same age, education, and past work experience, this individual can lift, and or carry up to 20 pounds occasionally, and up to 10 pounds frequently, stand for three hours in an eight hour workday, walk for two hours in an eight hour workday, sit for five hours during an eight hour workday, occasionally balance, stoop, kneel, crouch, crawl, and climb, frequently handle, finger, and feel with both upper extremities, occasionally push, pull, and reach, including over his head with both upper extremities, frequently operate foot controls with both feet. This individual can have occasional exposure to extreme temperatures, unprotected heights, moving mechanical parts, humidity, wetness, fumes, odors, dust, gases, poor ventilation, and vibration. This individual . . . can occasionally operate a motor vehicle, this individual can maintain concentration and persistence for two hours at a time during an eight hour workday. And this individual can frequently interact with the general public, coworkers, and supervisors.

(Doc. 7, pp. 54-55) When asked if the third hypothetical person could perform any of plaintiff's past work, the VE answered, "No." (Doc. 7, p. 55) When the ALJ asked if the third hypothetical person could perform any other jobs, the VE answered "Yes," identifying "tanning salon attendant," "shipping and receiving layer," and "racker," all of which existed in significant numbers in the

economy.  (Doc. 7, pp. 55-56)

## C.  The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905.  Corresponding regulations outline the five-step sequential process – described below – to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.

> Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.

> Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then he is deemed disabled.

> Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform his past relevant work, in which case the claimant is not disabled.

> Fifth, the ALJ determines whether, based on the claimant's RFC, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2014).  While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile.  *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011)(internal quotation marks omitted).

The SSA's burden at step five may be met by relying on the medical-vocational guidelines, known in the practice as "the grids," but only if the claimant is not significantly limited by nonexertional impairment, and then only when "the characteristics of the claimant exactly match the characteristics of one of the rules." *Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must come forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253 (SSA)). In determining the claimant's RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); 20 C.F.R., 404.1523; 404.1545(a)(2); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 726 (6th Cir. 2014).

### III. ANALYSIS

#### A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374 (internal citations and quotation marks omitted). Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Gentry*, 741 F.3d at 722 (internal citation omitted); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374 (internal citation omitted). In other words, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be

conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).  On the other hand, an ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion may be justified based upon the record. *Gentry*, 741 F.3d at 722 (internal citations and quotation marks omitted).

## B.  Claims of Error

### 1.  Whether the ALJ Erred in Not Explaining Why the Hypotheticals to the VE Did Not Include All of the Limitations in Dr. Huang's Opinion After the ALJ Gave Dr. Huang's Opinion "Significant Weight" (Doc. 10, pp. 5-7)

Plaintiff advances two arguments in support of his first claim of error.  First, he argues that the ALJ failed to explain why she did not include Dr. Huang's opinion in the RFC assessment that plaintiff could not sit and/or stand for more than one hour at a time, and that he could not walk for more than 30 minutes at a time.  Second, plaintiff argues that the ALJ failed to include all of the limitations assessed by Dr. Huang, *i.e.*, the limitations noted above, in the hypotheticals to the VE thereby rendering faulty the hypotheticals that the ALJ posed to the VE.

Plaintiff's first argument turns on the nature of the doctor-patient relationship between Dr. Huang and plaintiff.  More particularly, the Act imposes standards on the ALJ's consideration of medical source evidence.  *Gayheart*, 710 F.3d at 375 (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)(quoting 20 C.F.R. § 404.1527(d)(2)).  As a general rule, an opinion from a medical source who has examined a claimant is given more weight than that of a source who has not performed an examination (nonexamining source), and an opinion from a medical source who regularly treats a claimant (treating source) is afforded more weight than an opinion of a source who has examined a claimant but does not have an ongoing treatment relationship (nontreating examining source).  *Gayheart*, 710 F.3d at 375 (citing 20 C.F.R §§ 404.1502 and 404.1527(c)(2)).  Plaintiff was referred to Dr. Huang for a one-time examination in connection with his claims.  Therefore, Dr.

Huang was a nontreating examining source.

Whereas the opinions of a treating source generally are entitled to "controlling weight," the opinions of nontreating examining sources such as Dr. Huang "are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376-77 (quoting 20 C.F.R. § 404.1527(c)(2)). Moreover, although the ALJ is required to provide "good reasons" for discounting the weight given to the opinion of a "treating source," *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)), the ALJ is not procedurally required to give "good reason" for the weight given to the opinion of a nontreating examining source, *see Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514-15 (6th Cir. 2010). Indeed, having accorded Dr. Huang's opinion "significant weight," the ALJ was not required by the regulations to provide any further explanation as to her treatment of Dr. Huang's opinion. *See Norris v. Comm'r. of Soc. Sec.*, 461 Fed.Appx. 433, 439 (6th Cir. 2012)("[A]n ALJ need only explain its reasons for rejecting a treating source statement because such an opinion carries 'controlling weight' under the SSA.")(citing *Smith v. Comm'r. of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007)("[T]he SSA requires ALJs to give reasons for only *treating* sources." (italics for emphasis in the original)). Because the ALJ was not required to explain why she discounted the parts of Dr. Huang's opinion at issue here, plaintiff's first argument lacks an arguable basis in the law and, as such, his first argument is without merit for this reason alone.

Notwithstanding that plaintiff's first argument lacks an arguable basis in the law, the record shows that the ALJ did, in fact, explain her decision for not including in the RFC plaintiff's claim that he could not stand for more than an hour at one time, or walk for more than 30 minutes at one time. Noting at the bottom of p. 19 of the decision that plaintiff claimed "he cannot stand, walk or sit for long periods of time" (Doc. 7, p. 19), the ALJ went on to write in the middle of p. 20, "[d]espite the claimant's testimony that he cannot stand on his feet, the claimant told the consultative

examiner [Dr. Huang] that he can walk a mile . . . and treatment notes dated April 6, 2013 illustrate the claimant's reports that he walks routinely[14] . . . . These inconsistencies tend to cast doubt on the veracity of the claimant's statements" (Doc. 7, p. 20). In short, the ALJ's explanation was that plaintiff's claims he could not stand for more than an hour, or walk for more than 30 minutes, were not included in the RFC because those claims were not credible.

Although the ALJ did not mention Dr. Huang's 30-minute sitting limitation directly, the Magistrate Judge finds that the ALJ's credibility reasoning pertains to it as well. As noted above, the ALJ's analysis began with the observation that plaintiff claimed he "cannot stand, walk **or sit** for long periods of time" (emphasis added), and concluded with the determination that "inconsistencies tend to cast doubt on the veracity of the claimant's statements." In two of the three paragraphs in between, the ALJ twice called plaintiff's credibility into question, *i.e.*, "claimant's statements concerning the intensity, persistence and limiting effects . . . are not credible to the extent they are inconsistent" with the RFC, and "the undersigned does not fully credit plaintiff's testimony." (Doc. 7, p. 20) Moreover, as noted above at p. 8, plaintiff testified at the hearing that he was unable to sit for more than 30 minutes at a time "because [he had] never been used to just staying in one spot." Plaintiff's admission amounts to a *prima facie* showing that this claim was not credible inasmuch as plaintiff's alleged inability to sit for more than 30 minutes was not due to any medically related physical or mental impairment – it was due to a matter of personal habit. Plaintiff's claim also lacks credibility given, as noted above at pp. 7-8, he spends most of his day sitting around.

Credibility determinations regarding an applicant's subjective complaints such as those noted

---

[14] The "walks routinely" note appears in the clinical record of treating physician, Dr. Catherine McGowan, M.D., Vanderbilt University Medical Center, dated April 6, 2012. (Doc. 7, p. 533)

above rest with the ALJ and are afforded great weight and deference as long as they are supported by substantial evidence. *See Torres v. Comm'r of Soc. Sec.*, 490 Fed.Appx. 748, 755 (6th Cir. 2012). An ALJ's credibility assessment will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Indeed, the Sixth Circuit has "held that an administrative law judge's credibility findings are virtually 'unchallengeable.'" *Ritchie v. Comm'r of Soc. Sec.*, 540 Fed.Appx. 508, 511 (6th Cir. 2013)(quoting *Payne v. Comm'r of Soc. Sec.*, 402 Fed.Appx. 109, 112-13 (6th Cir. 2010)). Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 (SSA).

The ALJ's credibility determinations complied with the regulations, and are supported by substantial evidence. Because the ALJ's credibility determinations address why the limitations at issue were not included in the RFC, plaintiff's first argument is without merit for this reason as well.

Plaintiff's second argument turns on whether, by not including the limitations at issue, the ALJ's RFC determination was incomplete/inaccurate. In deciding a claimant's RFC, the ALJ considers numerous factors in constructing a claimant's RFC, including the medical evidence, non-medical evidence, and the claimant's statements about what he is able to do. *See* 20 C.F.R. § 404.1545(a)(3); SSR 96-5p, 1996 WL 374183 at * 3; SSR 96-8p, 1996 WL 374184 at * 5. However, "[t]he ALJ is not required to simply accept the [opinion] of a medical examiner based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence." *Griffith v. Comm'r of Soc. Sec.*, __ Fed.Appx. ___, 2014 WL 3882671 at * 8 (6th Cir. Aug. 7, 2014)(citing 20 C.F.R. § 416.927(b)); *Bell v. Barnhart*, 148

15

Fed.Appx. 277, 285 (6th Cir. Aug. 7, 2014)(declining to give weight to a doctor's opinion that was only supported by the claimant's reported symptoms). Moreover, the ALJ is required to incorporate into the RFC only those limitations [s]he accepts as credible. *See Irvin v. Soc. Sec. Admin.*, __ Fed.Appx. __ , 2014 WL 3608506 at * 2 (6th Cir. July 22, 2014)(citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993)). Finally, where the ALJ's RFC determination is "supported by substantial evidence," that determination "cannot be set aside under 42 U.S.C. § 405(g)." *Smith*, 482 F.3d at 877.

As previously established, the limitations at issue here were based solely on plaintiff's subjective complaint to Dr. Huang. Apart from Dr. Huang's assessment, based entirely on plaintiff's subjective complaints, there is no medical evidence in the record that supports the conclusion that these alleged limitations were due to any medically determinable physical or mental impairment. Moreover, as discussed above at pp. 13-15, plaintiff's claims that he cannot stand and/or walk for more than an hour, and his claim that he cannot sit for more than 30 minutes, simply are not credible. Because these claims are not supported by any objective medical evidence, and because they are not credible, the RFC was not inaccurate/incomplete. Because the RFC was not inaccurate/incomplete, the hypotheticals posed to the VE's testimony were, in turn, not flawed. For these reasons, plaintiff's second argument is without merit.

###    2.   Whether the ALJ Erred in Relying on a Job That Did Not Exist in the Dictionary of Occupational Titles (DOT) in Reaching Her Decision (Doc. 10, pp. 7-8)

Plaintiff argues that one of the three jobs that the VE identified that plaintiff could perform, *i.e.*, "tanning salon attendant," was "nonexistent" because it is not listed in the DOT. (Doc. 10, p. 7) Plaintiff argues further that, because he cannot perform a "nonexistent" job, substantial evidence cannot exist that he can.

The regulations provide that "[w]ork exists in the national economy when there is a significant number of jobs (**in one or more occupations**) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. . . ." 20 C.F.R. § 404.1566(b); 416.966(b)(parenthetical statement in the original, emphasis added).

Assuming without deciding that the "tanning salon attendant" job, noted above at p. 9, does not exist in the DOT, the VE identified two other jobs that plaintiff could perform based on plaintiff's RFC that are in the DOT, *i.e.*, "shipping and receiving layer" and "racker," both of which were available in substantial numbers in the economy. Therefore, even if the VE erred in identifying a "nonexistent" job in her response to the ALJ's hypothetical, the error was harmless because the VE identified two other jobs that plaintiff could perform. Because any error on the VE's part was harmless, plaintiff's second claim of error is without merit.

### 3. Whether the ALJ Erred in not providing the VE with an "Adequate and Complete Description of the Plaintiff's Mental and Other Non-Exertional Limitations" (Doc. 10, pp. 8-9)

Plaintiff's first argument is that the ALJ "appears to have credited Dr. Doineau's restriction that Plaintiff had 'moderate' limitations in his ability to sustain concentration and pace[15] . . . [but that] . . . Dr[.] Doineau's opinion does not address what 'moderate' might mean in terms of specific limitations." (Doc. 10, p. 8) The focus of plaintiff's first argument is on the following statement in the RFC: "can maintain concentration and persistence for two hours at a time during an eight hour workday." (Doc. 7, p. 17) Plaintiff maintains that the RFC "must be supported by specific medical opinions . . . the ALJ is not free to draw . . . her own conclusions from raw medical data." (Doc. 10, p. 8) Plaintiff's second argument is that the ALJ failed to consider that his HIV medication caused

---

[15] Dr. Doineau actually wrote that plaintiff had "mild to moderate" limitations in concentration and pace. (Doc. 7, p. 425)

him to have diarrhea, or to ask the VE how diarrhea might affect plaintiff's ability to work.

In his first argument, plaintiff maintains that the ALJ reached her RFC determination by impermissibly interpreting "raw medical data." "Raw medical data" pertains to medical data that has not been interpreted such as that contained in charts, notes, laboratory results, imaging results, etc. Dr. Doineau's opinion does not constitute "raw medical data" within the accepted meaning of the phrase.

The next question is whether the ALJ erred in converting Dr. Doineau's opinion – expressed in the subjective terms "[m]ild to moderate" – into an hourly figure, *i.e.*, "two hours at a time." As noted above, plaintiff argues that a RFC "must be supported by specific medical opinions," the inference being that it was not.

The ALJ made the following observations relevant to the question above: "With regard to concentration, persistence or pace, the claimant has moderate difficulties. . . . While the claimant's concentration, persistence or pace **might be limited at times**, the totality of the evidence supports no more than moderate difficulties in this area. . . . [T]he results of [plaintiff's] mental status examination [performed by Dr. Doineau] were **normal**. . . . The claimant reported [to Dr. Doineau] that **he is able to concentrate**. Dr. Doineau opined that the claimant has . . . **mild to moderate limitation** in sustaining concentration or pace . . . ." (Doc. 7, pp. 16, 19)(emphasis added) A plain reading of the record reveals that these observations were based all, or in part, on Dr. Doineau's assessment. In short, that part of the RFC at issue was supported by "specific medical opinions."

Although plaintiff does not make the argument, the next obvious question, at least to the Magistrate Judge, is whether there is any basis in the regulations that would justify the 2-hour figure at issue. The short answer is, "There is."

Under the regulations, "most jobs" include a morning break, a lunch period, and an afternoon

18

break in approximately two hour intervals.  *See e.g, Rudd v. Comm'r of Soc. Sec.*, 531 Fed.Appx. 719, 730 (6th Cir. 2013)(citing SSR 96-9p, 61 Fed.Reg. 34478 (July 12, 2996)).  Taking the highlighted statements above at p. 18 together with SSR 96-9p it is apparent that the ALJ's RFC determination was not based on some arbitrary extrapolation of an hourly figure from Dr. Doineau's subjective assessment, but rather the ALJ's determination that plaintiff's limitations in concentration and persistence were not such that he would be precluded from performing "most jobs" under the conditions set forth in SSR 96-9p.  In other words, in determining that plaintiff was able to "maintain concentration and persistence for two hours at a time during an eight hour workday," the ALJ was stating – tacitly – that plaintiff was able to perform"most jobs" despite any moderate limitations in that regard, a determination, once again, supported by the Dr. Doineau's assessment.

As shown above, the ALJ did not impermissibly interpret "raw medical data," the RFC is based on Dr. Doineau's assessment, and the 2-hour figure at issue is supported/justified by reading the highlighted text above at p. 18 in the context of SSR 96-9p.  For these reasons, plaintiff's first argument is without merit.

Turning to plaintiff's second argument, the ALJ noted in her decision that plaintiff "testified . . . his HIV medications make him nauseous and cause diarrhea."  (Doc. 7, p. 19)  On the next page of her decision, the ALJ wrote that "inconsistencies" in plaintiff's testimony "tend[ed] to cast doubt" on the severity of his claims.  (Doc. 7, pp. 19-20)  The "inconsistencies" to which the ALJ referred included the inconsistencies in plaintiff's testimony at the hearing about diarrhea, discussed above at p. 8.  Taking these factors together, it is apparent that the ALJ took plaintiff's complaint of diarrhea into consideration in her decision.  Inasmuch as the ALJ took this issue into consideration, the first part of plaintiff's second argument is without merit.

Turning to the next question, the record shows that plaintiff presented to the Summit Medical

Center for chest pains in October 2009.  (Doc. 7, p. 305)  He denied having diarrhea upon admission.  (Doc. 8, p. 305)  Plaintiff reported having "frequent diarrhea" to Dr. Schuman, a nontreating examining source, in June 2010.  (Doc. 7, p. 416)  In October 2010, plaintiff was examined at Vanderbilt by Dr. McGowan, a treating source under the regulations.  (Doc. 7, pp. 455-57)  Plaintiff, who reported being "focused on [the] upcoming disability hearing appeal process," denied having diarrhea.  (Doc. 7, pp. 455-56)  In a November 2010 *Disability Report – Appeal*, Form SSA-3441, "completed on the Internet," plaintiff reported that Retrovir, prescribed for the treatment of his HIV, caused him to have "diarrhea or loose stools."  (Doc. 7, p. 198)  Finally, at the hearing in September 2012, plaintiff testified that his medication for HIV caused him to have diarrhea.  (Doc. 7, pp. 43, 59)  As noted above at p. 8, plaintiff testified initially that he had "severe" diarrhea every day.  However, he testified later that he had diarrhea "two or three times a week."

The following conclusions can be drawn from the paragraph above and the record.  First, the records above that refer to plaintiff's alleged diarrhea are based solely on plaintiff's subjective inputs.  Second, there is no objective medical evidence in the record that shows plaintiff's HIV medication caused him to have frequent/persistent severe diarrhea, or that he suffered from frequent/persistent severe diarrhea for any other reason. Third, Dr. McGowan, the only treating source to comment on the issue, reported that plaintiff denied having diarrhea.  Fourth, to the extent that plaintiff had diarrhea, the records support the conclusion that he did not have it all the time.  Fifth, plaintiff's testimony at the hearing as to the frequency/severity of his diarrhea was conspicuously inconsistent.

The question before the court actually is whether the ALJ erred in not including plaintiff's claim of frequent/persistent severe diarrhea in the hypotheticals to the VE.  In that regard, the law is "well established that an ALJ may pose hypothetical questions to a vocational expert [but] is

required to incorporate only those limitations accepted as credible by the finder of fact." *Winslow v. Comm'r of Soc. Sec.*, 566 Fed.Appx. 418, 421-22 (6th Cir. 2014)(citing *Casey*, 987 F.2d at 1235). The ALJ is not required to accept a claimant's subjective complaints, and "can present a hypothetical to the VE on the basis of [her] own assessment if [s]he reasonably deems the claimant's testimony to be inaccurate." *See Jones v. Comm's of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).

As shown above at pp. 19-20, plaintiff's claim of frequent/persistent severe diarrhea is based solely on his subjective complaints. As shown above at p. 8, plaintiff's testimony at the hearing concerning his alleged diarrhea was "conspicuously inconsistent," thereby rendering his claim not credible. For these reasons, the ALJ did not err because she did not ask the VE about this issue. Accordingly, plaintiff's second argument also is without merit.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 9) be **DENIED** and the Commissioner's decision **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 7th day of October, 2014.

_/s/ Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge